[No. B117633. Second Dist., Div. Four. July 12, 1999.]

THOMAS A. CURTIS et al., Plaintiffs and Appellants, v.
KELLOGG & ANDELSON et al., Defendants and Respondents.

## COUNSEL

Liner, Yankelevitz, Sunshine, Weinhart & Regenstreif, Stuart A. Liner, Peter J. Pitchess and D. Michael Oberbeck for Plaintiffs and Appellants.

Garrett & Tully, Stephen J. Tully and Daniel D. Kopman for Defendant and Respondent Kellogg & Andelson.

Lewis, D'Amato, Brisbois & Bisgaard, Mary G. Whitaker and Wayne C. Smith for Defendant and Respondent Cohen, Primiani & Foster.

## OPINION

**CURRY, J.**—The issue raised in this appeal is whether either appellant Thomas A. Curtis, M.D. (Dr. Curtis), or his medical corporation, appellant Thomas A. Curtis, M.D., Inc. (the Corporation), has standing to pursue a claim for legal malpractice purportedly assigned to Dr. Curtis by the chapter 7 trustee for the Corporation. We conclude, under the circumstances presented here, that only the trustee had standing to pursue the claim, and affirm the judgment of the trial court which sustained a demurrer to the complaint brought by appellants. We also affirm the trial court's determination that claims against the Corporation's former accountants were barred by the expiration of the applicable statute of limitations.

### FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts are not in dispute. Respondent Kellogg & Andelson (K&A), an accounting firm, gave tax advice to appellants, which resulted in the Corporation paying Dr. Curtis's wife $431,500 as employee compensation for the fiscal year ending April 30, 1988, and $510,500 for the fiscal year ending April 30, 1989, and prepared tax returns listing those expenses on the Corporation's income tax returns for the relevant years.

In 1990, the Internal Revenue Service (IRS) conducted an audit of the two tax returns. Respondent Cohen, Primiani & Foster (CP&F), a law firm, was

hired by the Corporation at K&A's recommendation to represent it in connection with the audit and the subsequent tax court review. On February 6, 1991, the IRS issued a notice of deficiency, stating that the amounts paid to Mrs. Curtis for fiscal years 1988 and 1989 exceeded a reasonable allowance for compensation and had to be reduced by $331,500 and $405,500, respectively. As a result, the Corporation owed in excess of $300,000 in back taxes plus substantial penalties and interest.[1] The Corporation sought review, and on January 11, 1994, the tax court affirmed the IRS's determination.

On December 23, 1994, the Corporation filed for bankruptcy protection. By an agreement approved by the bankruptcy court on June 2, 1996, and signed by the trustee, Dr. Curtis purported to purchase all of the assets of the Corporation including "causes of action whether filed or unfiled . . . ."

*The Original Complaint*

On October 9, 1996, Dr. Curtis, as sole named plaintiff, filed a complaint naming K&A and CP&F as defendants. The complaint purported to state claims for professional negligence, breach of fiduciary duty, fraud, and breach of contract. It stated that Dr. Curtis was the owner by assignment of claims possessed by the Corporation in that on June 15, 1996, Dr. Curtis purchased all of the assets, including all claims, whether filed or unfiled, of the Corporation.

The complaint alleged that due to advice received from K&A, the Corporation paid Mrs. Curtis an annual salary of $431,500 and $510,500 in 1988 and 1989, amounts which the United States tax court later ruled were excessive,[2] and that K&A "fail[ed] to advise the Corporation that the amounts paid as compensation to Mrs. Curtis for FYE 1988 and 1989 were excessive or that the Corporation even faced the possibility of penalties, and by its failure to disclose its negligence to the Corporation." To support damages, the complaint alleged that "[a]s a direct and proximate result of K&A's negligence, carelessness, and recklessness, the Corporation was required to pay penalties to the IRS, retain an attorney to represent it in the Audit and subsequent Tax Court proceedings, and Plaintiff suffered mental, physical and emotional pain and suffered a divorce . . . ."

Concerning the timeliness of the action, the complaint conceded that the IRS conducted an audit in 1990, and that the IRS's February 6, 1991, notice

[1] The amount due included penalties for "negligence or intentional disregard" of IRS rules and regulation.

[2] In addition to her salary, the Corporation provided Mrs. Curtis a 1986 Mercedes Benz, medical insurance, life insurance, a pension plan, and rent on a personally owned condominium.

of deficiency informed the Corporation that the amounts paid to Mrs. Curtis in 1988 and 1989 exceeded a reasonable allowance for compensation and had to be reduced by $331,500 and $405,500, respectively. In order to justify the belated filing of the complaint, Dr. Curtis alleged that K&A "continued to represent the Corporation in its tax matters (including the Audit and trial of this matter) and has repeatedly attempted to suppress any indication of its negligent tax advice." Specifically, K&A "repeatedly reassured the Corporation that the Audit and subsequent trial and penalties relating to Mrs. Curtis' compensation was an aberration," that executive compensation had recently become a "hot button," that K&A "had no knowledge of this nor any way of predicting the IRS would scrutinize Mrs. Curtis' compensation," and that "it was, therefore, not at fault." The complaint further alleged that "pursuant to 11. U.S.C. 108, among others, any statute of limitations applicable to any claim possessed by the Corporation at that time, whether filed or unfiled, was extended for a two year period from the date the assets of the Corporation fell within the control of the Trustee.[3] Any and all claims asserted herein are being asserted in order to satisfy creditors of the Corporation and/or to pay the IRS."

Concerning CP&F, the complaint alleged that the law firm failed to exercise reasonable care and skill in undertaking to perform legal services for the Corporation "in that it failed to disclose or intentionally suppressed from the Corporation the fact that K&A had been negligent in relation to Mrs. Curtis' FYE 1988 and 1989 compensation." The damages allegations were the same as those asserted in the malpractice claim against K&A.

Essentially the same factual and damage allegations served as the basis for the separate claims of breach of fiduciary duty, fraud, and breach of contract against K&A and CP&F. Respondents filed demurrers and motions to strike the original complaint based on the statute of limitations and the nonassignability of professional malpractice claims.

*The Bankruptcy Court Order*

On February 7, 1997,[4] the bankruptcy court approved and entered a stipulation and order which stated: "WHEREAS, this case was originally filed as a Chapter 11 bankruptcy and it has been subsequently converted to a

---

[3]Section 108 of 11 United States Code provides in relevant part: "If applicable nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of— [¶] (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or [¶] (2) two years after the order for relief." (11 U.S.C. § 108(a).)·

[4]The stipulation had been signed by the trustee on January 29.

Chapter 7[;] [¶] WHEREAS, on June 2, 1996, this court approved the sale by the Chapter 11 Trustee of all assets of the Debtor's estate to [Dr. Curtis] . . . ; [¶] WHEREAS, the above mentioned sale occurred; [¶] WHEREAS, included in the assets purchased by [Dr. Curtis] were all causes of action possessed by the Debtor, whether filed or unfiled, and the proceeds therefrom; [¶] WHEREAS, certain claims purchased by [Dr. Curtis] including certain professional malpractice causes of action, must be asserted in the name of the original holder of the cause of action, [the Corporation]; [¶] WHEREAS, the right to the proceeds from those non-assignable claims was included in the purchase by [Dr. Curtis]; [¶] WHEREFORE, IT IS HEREBY STIPULATED AND AGREED that [Dr. Curtis] shall have the right to assert all claims and/or causes of action, including but not limited to, claims for professional malpractice, which the Debtor possessed on or before June 2, 1996, in the name of the Debtor."

*The First Amended Complaint*

Rather than opposing the demurrers and motions to strike the original complaint, appellants filed a first amended complaint on January 31, 1997, adding the Corporation as a named plaintiff.[5] In connection with the contention that Dr. Curtis had purchased the assets of the Corporation, including all its choses in action, appellants inserted a footnote which explained: "Obviously, only those claims which, pursuant to California state law, are assignable were sold to Dr. Curtis. As to those claims which, as a matter of law, are non-assignable, they are brought in the name of the Corporation." Elsewhere the first amended complaint similarly stated: "In the previous Complaint, Dr. Curtis alleged that all claims had been assigned to him following the purchase from the bankruptcy, including those claims that are non-assignable. That allegation was in error. Dr. Curtis purchased directly from the bankruptcy estate all claims which could lawfully be assigned. Any other assignment is of no effect. Those claims which are non-assignable are asserted by and on behalf of the Corporation."

The first amended complaint also added the allegation that CP&F's representation of the Corporation continued uninterrupted until "approximately September 19, 1995."

Respondents demurred and moved to strike on the same grounds as were asserted previously. They contended that the amendments concerning ownership of the claims were a "sham" which should be disregarded. They further contended that only the trustee had the power to assert the Corporation's claims.

[5]The reference to causing Dr. Curtis's divorce was deleted.

The court sustained the demurrers based on *Boykin* v. *Cobin* (May 31, 1994) B056812 ([nonpub. opn.], review granted Aug. 18, 1994, review dismissed May 11, 1995)[6] ruling that the accounting firm could not be held liable as a matter of law for any damages flowing from the IRS *audit*, and allowing appellants to amend the complaint.

*The Second Amended Complaint*

The allegations of the second amended complaint, filed May 5, 1997, were essentially the same as the first, although in conformance with the trial court's ruling appellants omitted reference to damages flowing from the audit. Respondents demurred and moved to strike yet again.

This time, the court sustained the demurrers to the complaint without leave to amend. As evidenced by the transcript of the hearing, the court concluded that the claims against K&A were barred by the statute of limitations prior to the filing of the bankruptcy petition and that the continuous representation rule did not apply. The court further concluded that the legal malpractice claim could not be assigned and that appellants lacked standing to assert it.

Judgment was entered August 21, 1997. Notice of entry was served September 22, 1997. Appellants filed a timely notice of appeal on November 17, 1997.

DISCUSSION

I

*The Claims Against K&A Are Barred by the Statute of Limitations*

The parties agree that a claim for accounting malpractice is governed by the two-year statute of limitations contained in Code of Civil Procedure section 339, subdivision 1. (See, e.g., *International Engine Parts, Inc.* v. *Feddersen & Co.* (1995) 9 Cal.4th 606, 608 [38 Cal.Rptr.2d 150, 888 P.2d 1279] (*Feddersen*).)

In *Feddersen*, the Supreme Court held that for purposes of an accounting malpractice action based on an improperly prepared tax return,

---

[6]In *Boykin*, Division One of this district held that the plaintiff taxpayers could not maintain a claim against their accountant for expenses flowing from an audit because there was no way to establish why the IRS chose their return for review or attribute it to any negligence on the part of the accountant. Review was granted in 1994. The case should not have been cited or relied on by respondents or the trial court in 1997.

actual injury occurs so as to commence the running of the statute of limitations when a tax deficiency is assessed by the IRS. (9 Cal.4th at pp. 608-609.) The court expressly rejected the appellate court's conclusion that actual harm occurred, and the statute began to run, "when the client learn[ed], on receipt of a preliminary Internal Revenue Service (IRS) audit report, that the accountant's negligence *may* lead to imposition of tax deficiencies." (*Id.* at p. 608, original italics.) As the Supreme Court explained it, a rule tying actual harm and accrual of the statute of limitations to assessment of a tax deficiency "both conserves judicial resources and avoids forcing the client to sue the allegedly negligent accountant for malpractice while the audit is pending." (*Id.* at p. 620.) "It also avoids requiring the client to allege facts in the negligence action that could be used against him or her in the audit, without first allowing the accountant to correct the error (or mitigate the consequences thereof) during the auditing process. [Citation.]" (*Ibid.*)[7]

▆▆▆ Appellants do not dispute that the statute of limitations accrued on February 6, 1991, when the IRS issued its notice of deficiency. However, appellants contend that the statute was tolled by fraudulent concealment until January 11, 1994, when the tax court found that K&A had been negligent or intentionally disregarded IRS regulations in the preparation of its tax returns.

---

[7]K&A suggests that the statute might have accrued even earlier, in 1990 when the Corporation incurred attorney fees in connection with the audit. This possibility was specifically rejected by the Supreme Court in *Feddersen*: "Most taxpayers are likely to contact the accountant who prepared the returns in question for assistance in the audit process. If the taxpayer were required to file suit against the accountant at this time, the effort to clarify any mistakes in filing would be frustrated. [Citation.] [¶] The use of the date of deficiency assessment to mark the date of actual injury in accountant malpractice cases provides the parties with a bright line that, once crossed, commences the limitations period under section 339, subdivision 1, and therefore provides certainty in terms of the statute's application. Obviously, in some cases injury will be clear before the notice of deficiency is given to the taxpayer. But uniformity in application serves a more important function when interpreting statutes of limitation than does the identification of the precise point at which some harm might be said to have occurred, even if negative collateral consequences might arise from the *tentative* assessment of additional tax liability." (9 Cal.4th at pp. 621-622, original italics.)

K&A's reliance on the decision in *Van Dyke* v. *Dunker & Aced* (1996) 46 Cal.App.4th 446 [53 Cal.Rptr.2d 862] is similarly misplaced. There, the taxpayer donated a parcel of real property to charity on the advice of his accountant that the entire fair market value of the property would be a credit against taxes due. He learned from the accountant before the tax returns were filed that the advice was erroneous, and had to borrow money to pay the additional tax obligation due. Although the tax return was later subject to an audit, the court held that the date of the deficiency assessment was not the critical date for statute of limitations purposes because the injury derived from the donation of the property, not the preparation of the tax returns. *Feddersen* was distinguishable because "[t]he propriety of the tax advice they [the Van Dykes] received . . . was not contingent on the outcome of the IRS audit." (*Van Dyke* v. *Dunker & Aced, supra,* at p. 455.) As we read the complaint, appellants base damages on the penalties imposed due to improper calculation of taxes in the tax returns and not on the prepreparation advice given.

According to appellants, it was only then that the Corporation first discovered or reasonably could have discovered that it had actionable claims against the accountants or the attorneys. Up to that point, it was lulled into a false sense of security by K&A's assurances that the deficiency was an aberration that would be overturned on review by the tax court.

█ It is well established that a cause of action accrues once the plaintiff suffers harm and becomes aware of the necessary facts linking the defendant to the harm. (See, e.g., *Jolly* v. *Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1109 [245 Cal.Rptr. 658, 751 P.2d 923] ["[T]he accrual date of a cause of action is delayed until the plaintiff is aware of [his or] her injury and its negligent cause. [Citation.]" (Fn. omitted.)].) "Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, [he or] she must decide whether to file suit or sit on [his or] her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; [he or] she cannot wait for the facts to find [him or] her." (*Id.* at p. 1111.) "[A] plaintiff is under a duty to reasonably investigate and . . . a *suspicion* of wrongdoing, coupled with a knowledge of the harm and its cause, will commence the limitations period . . . ." (*Id.* at p. 1112.)

As discussed in Justice Mosk's concurrence in *Feddersen*, both *Feddersen* and an earlier case involving legal malpractice—*Laird* v. *Blacker* (1992) 2 Cal.4th 606 [7 Cal.Rptr.2d 550, 828 P.2d 691]—rejected a definition of actual harm that would have delayed accrual of the statute of limitations until all administrative and judicial procedures for review were exhausted. (*Feddersen, supra,* 9 Cal.4th at pp. 622-623.) The court chose the date of the assessment of the tax deficiency because that is the logical point at which a reasonable person should become suspicious of any improper advice previously given.

█ This fits in with the general rule that in a professional malpractice context, accrual does not await "[plaintiff's] discovery [that the facts constituting the wrongful act or omission] constitute professional negligence, i.e., [his] discovery that a particular legal theory is applicable based on the known facts." (*Worton* v. *Worton* (1991) 234 Cal.App.3d 1638, 1650 [286 Cal.Rptr. 410].) " 'It is irrelevant that the plaintiff is ignorant of his legal remedy or the legal theories underlying his cause of action . . . if one has suffered appreciable harm and knows or suspects that professional blundering is its cause, the fact that an attorney has not yet advised him does not postpone commencement of the limitations period.' [Citations.]" (*Ibid.,* quoting *Gutierrez* v. *Mofid* (1985) 39 Cal.3d 892, 898 [218 Cal.Rptr. 313, 705 P.2d 886].)

█ The Corporation knew as early as 1990, when the IRS auditors focused their attention on the salary paid to Mrs. Curtis, that there was some

question about the propriety of that deduction. By February 6, 1991, or shortly thereafter, the Corporation had notice that the IRS had solidified its position on the issue and established the amount of the injury by issuing the tax deficiency letter. These were the critical facts which should have aroused the Corporation's suspicions about the correctness of the actions previously undertaken by K&A. According to allegations of the complaint, K&A did not conceal these facts from appellants. K&A concealed only that the Corporation might have grounds for a negligence or malpractice cause of action under the facts known to all parties. As the cases have held, it is not necessary for the plaintiff to have knowledge of the specific applicable legal theories in order for the statute of limitations to accrue. Concealment of this type of information cannot, therefore, toll the statute of limitations. The Corporation had grounds to be suspicious of the tax advice given as soon as the IRS announced the audit in 1990. Its injury occurred when the tax deficiency was assessed in February 1991. At that point, it was the Corporation's responsibility to undertake basic inquiry to determine whether the material facts of which it was fully aware could form the basis for a legal claim.

Appellants alternatively contend that continued representation by an accountant should toll the statute of limitations and encourages this court to promulgate such a rule. The identical factual situation occurred in *Feddersen* where the accountant continued to represent the taxpayers in connection with the audit "in the hope that it could mitigate the extent of its alleged oversight." (9 Cal.4th at p. 609.) Justice Kennard, in a separate concurring and dissenting opinion, pointed to Code of Civil Procedure section 340.6 which tolls actions for attorney malpractice until representation ceases, and stated the case for applying the same rule to accountants: "Accountants no less than attorneys should be afforded an opportunity to correct their mistakes and to mitigate the client's damages without the client being compelled by the running of the statute of limitations to bring a malpractice action. Accountants no less than attorneys should be prevented from defeating a malpractice cause of action by continuing to represent the client until the statutory period has expired. Therefore, the articulation of the rule in the attorney malpractice statute should guide our construction of Code of Civil Procedure section 339, subdivision 1, as it applies to actions against an accountant for negligence in the preparation of an income tax return. In this case, I would hold that the limitations period did not begin to run while Feddersen continued to represent plaintiffs in the IRS audit of plaintiffs' tax returns." (*Feddersen, supra,* 9 Cal.4th at p. 632, fn. omitted.) Nevertheless, the majority of the court chose the date of the deficiency assessment rather than the date the representation ceased as the "bright line" for accrual of the statute of limitations. In the face of controlling Supreme Court authority and

in the absence of a statutory provision creating a tolling period for accountant malpractice during the representation, we are bound to calculate the limitations period from the date when the tax deficiency was assessed rather than the later date when K&A ceased representation of the Corporation. This means that the two-year statute ran in February of 1993, almost two years before the bankruptcy was filed in December of 1994, and the tolling provisions of 11 United States Code section 108 never came into play.

The same analysis renders appellants' claims against K&A for breach of fiduciary duty, fraud, and breach of contract untimely. Since the gravamen of the breach of contract and breach of fiduciary duty claims are the purported malpractice, the two-year statute of limitations applies. (See *Barton* v. *New United Motor Manufacturing, Inc.* (1996) 43 Cal.App.4th 1200, 1207 [51 Cal.Rptr.2d 328] ["The statute of limitations to be applied in a particular case is determined by the nature of the right sued upon or the principal purpose of the action, not by the form of the action or the relief requested."]; *Stoll* v. *Superior Court* (1992) 9 Cal.App.4th 1362, 1368 [12 Cal.Rptr.2d 354]; *Southland Mechanical Constructors Corp.* v. *Nixen* (1981) 119 Cal.App.3d 417, 431 [173 Cal.Rptr. 917], disapproved on other grounds in *Laird* v. *Blacker, supra,* 2 Cal.4th at p. 617.) Assuming the fraud claim was adequately pled—it seems to be nothing more than a rehash of the "fraudulent concealment" allegations which we have held to be insufficient to toll the statute of limitations for the malpractice claim—it is subject to a three-year statute of limitations. (Code Civ. Proc., § 338.) The bankruptcy was filed almost four years from the date when appellants should have been aware of the falsity of the alleged statements.

Our analysis of the statute of limitations probably also defeats the legal malpractice claim, the essence of which is CP&F's failure to advise appellants to investigate the possibility of a malpractice claim against K&A. Since the trial court ruled, and we have affirmed, that appellants should have been on notice of the possibility of a claim against K&A by no later than the date of the tax deficiency assessment, there would appear to be no basis for a claim against CP&F. Rather than resolve this issue, however, we will discuss the standing issue relied on by the trial court in sustaining CP&F's demurrer and argued by the parties in their briefs.

## II

### *Appellants Lack Standing to Assert the Legal Malpractice Claims*

The second issue raised by the appeal is whether either Dr. Curtis or the Corporation, the two plaintiffs named in the second amended complaint, had standing to assert a cause of action for legal malpractice against CP&F.

We start with the well-established proposition that legal malpractice claims are not assignable as a matter of California public policy. (*Kracht* v. *Perrin, Gartland & Doyle* (1990) 219 Cal.App.3d 1019, 1023 [268 Cal.Rptr. 637]; *Jackson* v. *Rogers & Wells* (1989) 210 Cal.App.3d 336, 348-349 [258 Cal.Rptr. 454]; *Goodley* v. *Wank & Wank, Inc.* (1976) 62 Cal.App.3d 389, 395 [133 Cal.Rptr. 83].) Courts have long recognized that claims for legal malpractice are analogous to other types of claims which are not assignable, because the attorney-client relationship (although containing contractual elements) is unique and involves a highly personal and confidential relationship, making the relationship more akin to a contract of a personal nature than to an ordinary commercial contract.

*Kracht* applied the rule of nonassignability to all purported assignments of legal malpractice claims, whether voluntary or involuntary, and held that public policy concerns are violated by any such assignment. The court in *Kracht* reasoned that if assignability were allowed, a lawsuit for legal malpractice could be filed, even though the former client (to whom the duty was owed) was entirely satisfied with the services and opposed the filing of the lawsuit. (219 Cal.App.3d at p. 1024.) Moreover, a suit brought on a claim acquired by involuntary assignment, and against the client's wishes, places the attorney in an untenable position: He must preserve the attorney-client privilege (the client having done nothing to waive the privilege) while trying to show that his representation of the client was not negligent. (*Ibid.*)

In the recent case of *Baum* v. *Duckor, Spradling & Metzger* (1999) 72 Cal.App.4th 54 [84 Cal.Rptr.2d 703], the grant of a demurrer without leave to amend was sustained where a complaint for legal malpractice and breach of fiduciary duty was brought by the purported assignee who had obtained assignment of the claim from the bankruptcy trustee for the clients—two debtor corporations. The purported assignee was an ordinary creditor of the corporations.

The court traced the development of California's case law establishing the general rule conferring assignability of choses in action which arise out of an obligation, breach of contract, violation of a right of property, or damage to personal or real property. (See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 933, pp. 833-834, and cases cited therein.) On the other hand, those which arise from a wrong done to the person, the reputation, or the feelings of the injured party, and from breaches of contracts of a purely personal nature (like promises of marriage) were deemed to be nonassignable.

The court recognized that numerous public policy considerations are involved in the determination of whether claims for legal malpractice should

be assignable. The most important is the nondelegable duty of undivided loyalty and diligence in representing the client, which every attorney owes. Assignability would encourage commercialization of claims and would force attorneys to defend themselves against persons to whom no duty was ever owed. In addition, assignment could (1) encourage unjustified lawsuits; (2) generate increased malpractice lawsuits, burdening the profession, the court system and the public; (3) promote champerty; and (4) reduce the public's access to legal services. Based on all these considerations, the court held that a legal malpractice claim may not be assigned by the trustee of the bankruptcy estate of the corporate client to a creditor of the corporation or any other person.

At the same time, the court recognized that "the [debtor] corporations' potential legal malpractice claims against [the law firm] are property of the respective bankruptcy estates of the corporate debtors . . . under 11 United States Code section 541, notwithstanding the rule in California under the *Goodley* and *Kracht* decisions that the assignment of such claims, whether voluntary or involuntary, is not permitted as a matter of public policy. . . . [T]he legal malpractice cause of action at issue in this appeal originally belonged to the bankrupt corporations, and became property of their respective bankruptcy estates by operation of law under 11 United States Code section 541 upon the filing of the petitions that commenced the bankruptcy proceedings. [Citation.]" (*Baum* v. *Duckor, Spradling & Metzger, supra,* 72 Cal.App.4th at pp. 69-70, citing *In re J.E. Marion, Inc.* (Bankr. S.D.Tex. 1996) 199 B.R. 635, 636.)

*Baum* and the cases on which it relied confirm that the bankruptcy trustee could not, as he originally attempted to do, sell or assign the potential malpractice claim to Dr. Curtis. Although Dr. Curtis was apparently the sole owner of the Corporation that was CP&F's client, for legal purposes, the Corporation has separate rights and a separate identity, and to assign a legal malpractice claim belonging to the Corporation would violate established California law.

This brings us to the subsequent bankruptcy court order purporting to give Dr. Curtis the right "to assert all claims and/or causes of action, including but not limited to, claims for professional malpractice, which the Debtor possessed on or before June 2, 1996, in the name of the Debtor." CP&F contends it is a veiled attempt to assign the claim to Dr. Curtis, and is invalid for the reasons discussed above. We see it somewhat differently. The trustee was apparently attempting to give Dr. Curtis permission to proceed against CP&F in the name of the Corporation. The difficulty here is we are aware of no Bankruptcy Code provision—and appellants cite us to none—that would permit the trustee to proceed in this fashion.

Under section 541 of the Bankruptcy Code, the bankruptcy estate includes all of the debtor's legal and equitable interest in property as of the commencement of the case, including choses in action. (11 U.S.C. § 541.) Under the code, the trustee acts as the representative of the estate with the capacity to sue or be sued. (11 U.S.C. § 323; see also 11 U.S.C. § 704(1).) As such "[t]he authority to collect the debtor's assets is vested exclusively in the trustee. [Citations.]" (*Matter of Perkins* (7th Cir. 1990) 902 F.2d 1254, 1257-1258.) Under section 327(a), the trustee, with the court's approval may employ persons "to represent or assist the trustee in carrying out the trustee's duties" but the persons employed must be "attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate," and be "disinterested"—that is "not a creditor, an equity security holder, or an insider[.]" (11 U.S.C. §§ 101(14), 327(a).) Clearly, Dr. Curtis does not fall within this definition. More importantly, it is clear from the bankruptcy court order that Dr. Curtis is not pursuing the claim on behalf of the trustee or for the benefit of the estate. The agreement states that any proceeds recovered will go directly to Dr. Curtis.

Put simply, once the bankruptcy petition was filed, the property of the Corporation became the property of the estate, and the trustee—not the debtor—had the sole capacity to represent the estate and sue or be sued. (11 U.S.C. § 323; see, e.g., *Haley* v. *Dow Lewis Motors, Inc.* (1999) 72 Cal.App.4th 497, 504 [85 Cal.Rptr.2d 352], quoting *Chrysler Credit Corp.* v. *B.J.M., Jr., Inc.* (E.D.Pa. 1993) 834 F.Supp. 813, 839 ["It is of course indisputable that any causes of action which accrue to a debtor who has filed for relief under the Bankruptcy Act before the filing of the bankruptcy petition become the property of the bankruptcy estate and may thereafter be prosecuted only by the trustee or a duly appointed representative of the estate. [Citations.]"]; *In re Eisen* (9th Cir. 1994) 31 F.3d 1447, 1451, fn. 2 ["Once appointed a trustee, the debtor's assets and claims pass to the trustee, making the trustee 'the proper party in interest, and the only party with standing to appeal the bankruptcy court's order.' "]; *Bkrtcy. Estate of B.J. McAdams* v. *Ralston Purina* (Bankr. N.D.Ga. 1993) 154 B.R. 809, 811 ["When the interim trustee was appointed on April 13, 1990, the trustee succeeded to all claims of the debtor for due and owing freight charges. . . . The debtor thereafter lacked standing to pursue such claims."].)

As to the Corporation's existing legal claims, the code contemplates that the trustee will either (1) pursue the claim in his own name with or without the help of persons employed "to represent or assist" him under section 327 of 11 United States Code, or (2) assign the claim to another party in exchange for payment of money into the estate for the benefit of all the

creditors.[8] The trustee apparently chose not to undertake the first option. The second option was foreclosed by California law insofar as the legal malpractice claim was concerned. The trustee's attempt to grant permission to Dr. Curtis to pursue malpractice claims "in the name of the debtor" and keep all proceeds for his own benefit is not authorized by the code and did not add anything to the invalid assignment already made.

DISPOSITION

The judgment is affirmed.

Vogel (C. S.), P. J., and Hastings, J., concurred.

A petition for a rehearing was denied August 11, 1999.

---

[8]A third possibility is that the trustee will abandon the claim, thus clearing the way for the debtor to request permission from the court to pursue it in the debtor's own name. Abandonment requires "notice and a hearing" and a determination that the property "is burdensome to the estate or that [it] is of inconsequential value and benefit to the estate." (11 U.S.C. § 554.) No evidence of abandonment was presented here.